**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| Eva-Maria Lapinski | : | CIVIL ACTION |
| 6711 Townsend Drive | : | |
| Erie, P.A. 16505 | : | |
| | : | No.      1:22cv132 |
| Plaintiff, | : | |
| v. | : | JURY TRIAL DEMANDED |
| | : | |
| PNC Bank | : | |
| 901 State Street | : | |
| Erie, PA 16501 | : | |
| | : | |
| v. | : | |
| | : | |
| Christina Bernatowicz | : | |
| PNC Bank | : | |
| 901 State Street | : | |
| Erie, PA 16501 | : | |
| Defendants. | : | |
| | : | |

## CIVIL ACTION COMPLAINT

Plaintiff, Eva Maria Lapinski, by and through her undersigned counsel, hereby avers as follows:

### I.      Introduction

1.      Plaintiff has initiated this action to seek redress against the Defendants, her former employers, for violations of the Family and Medical Leave Act.

### II.      Parties

2.      Plaintiff, Eva Maria Lapinski (hereinafter "Plaintiff") is an adult individual currently residing at the above address.

3.      Defendant, P.N.C. Bank, (hereinafter "Defendant') is a limited liability corporation, organized under the laws of the Commonwealth of Pennsylvania and headquartered in Pittsburgh, Pennsylvania.

4.     At all times relevant hereto, the Defendant acted by and through its agents, servants, and employees, each of whom, at all times relevant hereto, acted within the scope of their job duties.

5.     Defendant P.N.C. is an "employer" within the meaning of the FMLA because it is engaged in an industry affecting commerce and because it maintains or maintained fifty (50) or more employees within seventy-five (75) miles of Plaintiff's worksite for each working day in each of twenty (20) or more weeks in the current or preceding calendar year.

6.     Defendant Christina Bernatowicz was the Plaintiff's supervisor and can be held individually responsible for violations of the FMLA.

7.     Plaintiff is an "eligible employee" within the meaning of the FMLA because he was: (a) employed by Defendant for a period of at least twelve (12) months; and (b) worked at least 1,250 hours in the twelve months immediately preceding the scheduled commencement of her FMLA leave.

### III.     Jurisdiction and Venue

8.     All of the allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

9.     The Court may properly maintain personal jurisdiction over the Defendants because the Defendants' contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over the Defendant to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in *International Shoe Co. v. Washington*, 326 U.S. 310 (1945) and its progeny.

10.    The Court may exercise original subject-matter jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) because it arises under the laws of the United States and seeks redress for violations of civil rights.

11.    Venue is properly laid in the Western District of Pennsylvania pursuant to 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2) because the Defendant is located in and conduct business in this judicial district and because a substantial part of the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district  (the Plaintiff was employed in the Western District of Pennsylvania at the time of the unlawful actions set forth herein.)

## IV.    Factual Background

12.    All of the allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

13.    Plaintiff began working for P.N.C. Bank on January 10, 1994, as a part-time teller, at the Kearsarge Branch.

14.    A new branch manager,  Christina Bernatowicz (hereinafter 'Ms. Bernatowicz'), was assigned to the branch in 1995.

15.    Plaintiff was promoted to a full-time teller position and then to head teller by 1996.

16.    Plaintiff continued in this role until 1998 when she was promoted to personal banking representative at the Airport Branch.

17.    Plaintiff's new role was to assist customers with opening new accounts, facilitating loan applications, customer service, and problem resolution.

18.    In 2000 or 2001, P.N.C. reorganized employee roles within the retail bank.

19.    Plaintiff was assigned the role of a full-time, outbound sales associate, later accepting a lateral move to teller supervisor.

20.     In 2002 or 2003, P.N.C. again reviewed retail banking efficiency and piloted a program in which a high-performing sales manager was given the office with the highest opportunity for growth.

21.      In Erie, PA, the manager was Ms. Bernatowicz, who handpicked Plaintiff into joining her team as a teller supervisor.

22.     In 2004, Plaintiff was promoted to assistant manager.

23.     Plaintiff was promoted to the branch manager position of the Robin Drive Branch and became an officer, an AVP of retail banking, in the summer of 2005.

24.     Plaintiff was also selected as a consultant for other branches' performance, efficiency, and operational soundness.

25.     Approximately eight months after being promoted to the branch manager position of the Robin Drive branch, Plaintiff was requested to meet with Ms. Bernatowicz, who had herself recently been promoted to the role of Regional Manager in charge of all Erie, Warren, and Crawford County P.N.C. branches.

26.      At this meeting, Plaintiff was requested to return to the Kearsarge Branch as the branch manager.

27.     The Kearsarge Branch had been unable to maintain the high efficiency, operational soundness, and high sales performance under the new management team.

28.     Plaintiff accepted the promotion to branch manager of the Kearsarge Branch and was also promoted to V.P. in retail banking.

29.     Plaintiff remained the manager of the Kearsarge Branch.

30.     In 2008, she took on the extra burden of supervising the employees of the Kearsarge Branch and associated remotely located drive-thru, as well as the newly acquired East 38th Street branch, when the branch manager of that location was unable to fulfill the duties of the role.

4

31.     P.N.C. Bank acquired National City Bank in 2008, and all "new to P.N.C." branch employees were evaluated and trained in P.N.C.'s policies.

32.     During this transition, Plaintiff took on the additional responsibilities of overseeing the consolidation activities of the National City legacy locations at the East 38th Street branch and the 18th & State Street branch, as well as acting as interim manager of the P.N.C. legacy locations at 9th & State Street and the Bayview Branches, a satellite office of 9th & State.

33.     In effect, Plaintiff managed six locations with zero adjustments to her salary.

34.     For many years Plaintiff consistently worked more than 45 to 50 hours a week.

35.     Plaintiff also acted as a representative for Ms. Bernatowicz by attending market-level conference calls and meetings in her place multiple times for many years.

36.     Plaintiff was the go-to person for all retail-related questions, problems, and issues experienced by customers of other lines of business located in the 9th & State Street P.N.C. building, such as Commercial Banking, Wealth Management, P.N.C. Investments, Dealer Finance, Estate Services, etc. Plaintiff assisted P.N.C. partners in these and other lines of business in resolving issues and providing service to their customers.

37.     In November 2009, Plaintiff accepted a promotion as the banking center manager of the 9th & State and Bayview branches and remained its manager until November 10, 2020, when her employment was terminated.

38.     Plaintiff first applied for FMLA in May 2019 because she needed treatment for breast cancer.

39.     Plaintiff endured three surgeries and, by September 2019, began five days per week of radiation treatments for five weeks.

40.     Before surgery, Plaintiff's supervisor, Christina Bernatowicz, told Plaintiff that she didn't need her radiation treatments to be done by The Cleveland Clinic.

5

41.    The Cleveland Clinic had given the Plaintiff the option of a lumpectomy, mastectomy, or a double mastectomy, unlike in Erie, PA, where the surgeon advised that she only needed a lumpectomy.

42.    Plaintiff opted to proceed with the double mastectomy to reduce the chances of breast cancer recurrence.

43.    Due to this procedure, it was found that Plaintiff's cancer had spread to lymph nodes in her left breast, far outside of the area recommended for the lumpectomy.

44.    When Plaintiff discussed her upcoming treatment plan, as proposed by The Cleveland Clinic, she informed Ms. Bernatowicz that she would not be able to return to work until she had completed her radiation and/or chemotherapy.

45.    Ms. Bernatowicz asked why she could not complete the radiation and/or chemotherapy treatments in Erie and attend work simultaneously, as had other employees who were being or had been treated for cancer.

46.    Plaintiff explained that her radiation oncologist informed her that they did a special heart and lung-sparing radiation treatment in Cleveland.

47.    Further, the oncologist had told her that the cancer center in Erie, PA, was not sufficiently equipped to perform that same treatment

48.    A few days later, Ms. Bernatowicz informed Plaintiff that she had personally discussed the Plaintiff's treatment plan with an employee of The Regional Cancer Center, located in Erie

49.    The Regional Cancer Center employee had allegedly told Ms. Bernatowicz that it could perform the heart and lung-sparing radiation.

50.    Ms. Bernatowicz clarified that she was dissatisfied with and opposed Plaintiff's absence from the office for 14 weeks or more due to the radiation treatments.

6

51.    When Plaintiff went out on FMLA, neither she nor her doctors anticipated she would need three surgeries before her radiation treatments.

52.    Plaintiff's radiation treatments got pushed back until she was sufficiently healed from surgery.

53.    Plaintiff's surgery and complications thereafter delayed her return to work until the first business day of 2020.

54.    At the end of March 2020, due to Covid, P.N.C. Bank created emergency pandemic response protocols.

55.    These Protocols included but were not limited to branch and other front-line support employees being separated into two groups, either the "Blue Team" or the "Orange Team."

56.    The purpose was to allow branch offices to remain open to meet customer needs with as little disruption as possible while effectively isolating branch personnel from coworkers on the opposite team.

57.    Each team was required to work two weeks on-site and the following two weeks off-site (home).

58.    If an employee were exposed to Covid-19 or were symptomatic, only those working directly with that employee would be in danger of contracting the virus, thus avoiding closing branches due to quarantine requirements.

59.    During team deployment on-site, employees were expected to work two six-day work weeks, a minimum of 40 hours, servicing customers to the best of their abilities and following established safety measures.

60.    Employees were expected to report worked hours via standard procedures while working in the branch. Management was told to enter employee time during off-site deployment as "Company Approved Time Off."

61.     During team deployment off-site (home), all employees were expected to attend daily conference calls and training sessions and complete internal online educational courses.

62.     As a Banking Center Manager, Plaintiff was expected to attend up to four conference calls per day and make herself available from 8:00 am until 6:30 pm Monday through Friday, and 8:30 am to 3:00 pm on Saturdays to assist on-site team members.

63.     P.N.C. Bank chose to report hours for employees during their off-site rotation as "Company Approved Time Off," even though employees were working, specifically employees such as Plaintiff, who were assigned a company-owned laptop.

64.     This time reporting is the pretext Defendant used to deny Plaintiff FMLA due to her medical condition.

65.     In not reporting Plaintiff's work hours, Defendant characterized her as ineligible for FMLA eligible, due to her absence of work hours, which Defendant had refused to report correctly and credit.

66.     During both on-site and off-site rotations, Plaintiff was assigned to participate in a particular project related to intake and submission of P.P.P. Loan applications and answering business owner questions related to P.P.P.

67.     Plaintiff was required to attend special online conference calls and training sessions via phone and Skype.

68.     Once P.N.C. was ready to accept applications, Plaintiff was assigned to the intake team to verify applications submitted by business owners were complete, in the correct format, including attachments such as business payroll, utilities, rent, mortgage or lease expenses, etc.

69.     Plaintiff was expected to work with business owners across P.N.C. Bank's footprint to help them understand what was needed and communicate with them regarding incomplete applications or missing information.

4891-9902-9530, v. 5

70.    Once all proper documentation was obtained, Plaintiff's responsibility was to forward each business's application package to underwriting for approval through the government application portal.

71.    Plaintiff worked a minimum of 40 hours per week during all on-site or off-site rotations.

72.    Even before Plaintiff was assigned to participate in the P.P.P. Loan project, which did not roll out until June or July 2020, she was expected to attend multiple daily meetings and be available or on-call during work hours when working from home.

73.    As an exempt employee, Plaintiff was never required to record hours via a timesheet, electronic or otherwise, unless she reported paid time off such as vacation days, personal days, or occasional absence days.

74.     During the emergency pandemic rotations, Plaintiff's supervisor was responsible for properly recording her hours on the off-site work weeks.

75.    Plaintiff worked from home, and her hours were incorrectly entered as "Company approved time off."

76.    Plaintiff was not taking "paid time off; she was working from home.

77.    Defendant's refusal to accurately report Plaintiff's accrual of "worked hours" made Plaintiff ineligible for FMLA.

78.    P.N.C. falsified Plaintiff's timesheets by mischaracterizing her work at home as unpaid 'Company approved time off.'

79.    Plaintiff was denied FMLA for her ongoing severe medical issue, which she had reported to her supervisor.

80.    In addition, Plaintiff contacted P.N.C.'s Employee Relations/Disability/Payroll Department no less than two times in 2020 to inquire about her eligibility under FMLA and was told she had not worked enough hours.

81.    Plaintiff explained that P.N.C. had failed to report her time correctly.

82.    Plaintiff told her supervisor what she had been told by a P.N.C.'s Employee Relations/Disability/Payroll Department.

83.    Plaintiff's supervisor did nothing to correct the situation.

84.    On or around October 15, 2020, Plaintiff informed her supervisor of her intention to schedule surgery in November, as soon as she became eligible for FMLA.

85.    Plaintiff's employment was terminated a month later.

86.    On October 26, 2020, Plaintiff was called into a surprise meeting to discuss a situation that occurred about two months prior, possibly in August or early September 2020.

87.    Plaintiff was asked questions about this incident by a P.N.C. Employee Relations Code of Conduct Investigator (heretofore known as 'Investigator').

88.    Plaintiff was informed she was accused of lying about knowing of the presence of a market-level employee, who was starting her day in Plaintiff's branch before informing her supervisor that she was running late.

89.    According to the complaint, Plaintiff was late for work and sent her assistant manager a text saying she would be late.

90.    She then texted her supervisor, informing her of the same.

91.    Plaintiff's supervisor, Ms. Bernatowicz, immediately called Plaintiff and accused Plaintiff of only informing her because Plaintiff knew this outside employee was present and would report her tardiness.

92.    That is not true.

10

93.    When questioned by the Investigator, Plaintiff could not recall all of the details from the morning in question and had not been informed that she would be questioned.

94.    Plaintiff was asked if she had the text messages or phone log as proof.

95.    Plaintiff stated she didn't think she would ever have a reason to save random text messages or call logs from months prior.

96.    Plaintiff responded to all questions to the best of her ability, frequently stating she did not recall certain aspects of the morning in question since she had been unwell and the events had occurred months before.

97.    Plaintiff explained to the Investigator that she had been experiencing ongoing health issues related to her previous FMLA claim and short and long-term disability from 2019.

98.    She explained this was why she had been coming in late, 15 to 30 minutes, upon occasion.

99.    The Investigator asked why Plaintiff had not sought protection under FMLA.

100.    Plaintiff explained how Defendant had incorrectly reported her time during pandemic off-site rotations and had thus wrongly disentitled Plaintiff to her FMLA.

101.    The Investigator then asked why Plaintiff had not requested a personal leave of absence.

102.    Plaintiff explained that she did not need an unpaid, personal leave of absence but required intermittent FMLA on the days she experienced severe nausea, numbness, or pain and needed only minor adjustments to her start time.

103.    Plaintiff further stated that she had consistently continued to work 45 to 50 hours per week, despite her ongoing health concerns, always foregoing lunch breaks.

4891-9902-9530, v. 5

104.     After this exchange, the Investigator informed the Plaintiff she was being placed on administrative leave while they continued their investigation. Plaintiff was required to turn in all P.N.C. property and was escorted from the premises.

105.     Throughout the year, Plaintiff had spoken with Ms. Bernatowicz multiple times about the difficulty she was experiencing with medication, the side effects of which made her extremely sick in the morning, as well as dexterity, pain, and numbness related to lymphedema, a condition caused by the removal of lymph nodes.

106.     At that time, Ms. Bernatowicz said an employee of another line of business had blamed Plaintiff for his poor sales performance.

107.     This unnamed employee of P.N.C. Investments allegedly stated that Plaintiff was late or absent from many of the meetings he was assigned to facilitate.

108.     This unnamed employee felt he was not receiving the support he needed from Plaintiff because of her absence during 15-minute morning meetings.

109.     Notably, Plaintiff was available the rest of the day to assist and support the unnamed P.N.C. Investments employee.

110.     When Plaintiff had appointments, she tried to schedule them before or after business hours.

111.     Plaintiff always ensured someone was assigned to facilitate the branch's daily quick start meetings when she would not be there.

112.     The unnamed P.N.C. Investments employee was allegedly one such person.

113.     Ms. Bernatowicz further stated that Plaintiff's employees were allegedly complaining of her tardiness, to which Plaintiff responded that she had been candid with her employees about her medical issues.

4891-9902-9530, v. 5

114.    All Plaintiff's employees were aware Plaintiff worked 45+ hours per week, despite coming in a little late on some days.

115.    There had been multiple days within one week when Plaintiff had to pull off the road due to nausea, turn around, return home, and call off work.

116.    Plaintiff also experienced serious dexterity and mobility issues, which were more pronounced in the morning or after long periods of inertia.

117.    Plaintiff suffered from numbness and nerve pain due to lymphedema.

118.    Plaintiff struggled with routine morning tasks requiring dexterity, such as brushing her teeth, showering, applying make-up, styling hair, dressing, typing, and holding a phone.

119.    Although Plaintiff was getting used to her prescribed medicine, she was often unable to use her hands, sometimes upwards of the first two hours after waking in the morning.

120.    Ms. Bernatowicz told her that Plaintiff needed to let her know, as Plaintiff's supervisor, if she would be late.

121.    Approximately a week later, in August or September, Plaintiff sent a text to her assistant manager to let her know she was running late due to feeling nauseous.

122.    Almost immediately after, Plaintiff texted Ms. Bernatowicz and told her she was running late.

123.    Plaintiff was composing the text messages during traffic stops, as she does not text while driving.

124.    Plaintiff did not read the incoming texts while composing her text messages.

125.    Plaintiff noted she received a response from her assistant manager but did not read it until she sent the text to Ms. Bernatowicz.

126.    Ms. Bernatowicz called Plaintiff, and almost immediately after, Plaintiff hit "send," yelling at her and accusing her of lying.

13

127.    After that verbal exchange, Plaintiff read the message from her assistant manager, telling her of the market level employee's presence in the branch.

128.    Ms. Bernatowicz accused Plaintiff of only telling her she was running late because there was someone at the office who would report the tardiness.

129.    Plaintiff said that wasn't true and objected to the accusation that she was being dishonest.

130.    Later, Plaintiff opined that the worst that would have happened would have been a written warning after multiple additional tardies.

131.    One tardy would not have even been grounds to move to the next step of disciplinary action since the protocol is a written warning first.

132.    Probation would have followed a written warning, and termination would only be possible after exhausting all the aforementioned steps.

133.    Plaintiff was terminated for "an act of dishonesty," effective November 10, 2020.

134.    On or around October 15, 2020, Plaintiff had disclosed explicitly to her supervisor that she would be requesting FMLA as soon as she was eligible and would be having surgery in November 2020, the same month she was terminated.

135.    On October 26, 2020, Plaintiff was placed on administrative leave pending the investigation of events that had occurred in August or September.

136.    Plaintiff had been forthcoming with Ms. Bernatowicz of her intent to schedule additional surgery related to her breast cancer from the onset of 2020.

137.    Plaintiff indicated she would wait until after the summer, so she would not be leaving the branch shorthanded during their busiest months.

4891-9902-9530, v. 5

138.    After Plaintiff disclosed to Ms. Bernatowicz the physical challenges she was experiencing, Plaintiff assumed she would be eligible by August 2020 to schedule her subsequent surgery, which she hoped would relieve many of her symptoms.

139.    In July or August 2020, Plaintiff called Payroll/Disability and was informed that she was three months short of eligibility due to Defendant failing to credit Plaintiff's hours while working from home.

140.    Even by Defendant's shorting of Plaintiff's credit hours, Plaintiff was almost eligible for FMLA when she was put on administrative leave.

141.    Due to Defendant's misreporting of her hours, Plaintiff was informed that she would not be eligible for FMLA until November 2020.

142.    When Plaintiff told Ms. Bernatowicz about the false reporting of her hours, Ms. Bernatowicz said she would look into it.

143.    Ms. Bernatowicz further stated to Plaintiff that Plaintiff's surgery was not "critical" since it was a cosmetic reconstruction procedure.

144.    Ms. Bernatowicz did not credit Plaintiff with the correct hours she was entitled to for FMLA eligibility.

145.    Further, Plaintiff and other employees, specifically the entire Erie Region Management Team, were told by Ms. Bernatowicz many times that she believed employees abuse Occasional Absence Days and FMLA.

146.    Ms. Bernatowicz told employees to challenge anyone who tried to call off or schedule medical appointments or surgeries covered under FMLA if any of its these were inconvenient to the running of the business.

147.    Plaintiff and other employees witnessed and experienced the retaliation by Ms. Bernatowicz when they returned to work from FMLA and long-term disability.

15

148.    One such disparate action was denying Plaintiff sufficient training on newly implemented operating and reporting systems, which had replaced the internal programs and telephone systems Plaintiff had used before her FMLA in 2019.

149.    At least two other managers experienced this same lack of retraining/training on programs and systems upon returning from FMLA and long-term disability.

150.     All other employees were trained on using these programs in a classroom setting or via Skype meetings and in-person manager meetings during the time allotted for such training.

151.    Plaintiff was expected to learn no less than six new systems, critical to her overall performance and service delivery to customers while doing all of her prior duties.

**COUNT I**
**INTERFERENCE WITH FMLA**
**PLAINTIFF VS. BERNATOWICZ**

152.    All of the allegations contained in the foregoing paragraphs are incorporated by reference herein as if the same were set forth at length.

153.    Plaintiff needed to take FMLA in November 2020 for a medical condition Defendant Bernatowicz described as 'cosmetic.' Serious medical condition.

154.    Bernatowicz knew that Plaintiff had significant side effects from her treatment for cancer which sometimes made her late coming to work.

155.    Bernatowicz knew that Plaintiff had a long and storied record at P.N.C. Bank and had never shirked any responsibility or violated any duty.

156.    Bernatowicz was told by Plaintiff that P.N.C. was not properly accruing her work hours, depriving her of FMLA eligibility.

157.    Bernatowicz did nothing to correct those hours, but when she heard that Plaintiff would take FMLA in November 2020, she interfered by creating the pretext of Plaintiff 'lying' and having her terminated after more than 26 years of service.

158.    The foregoing conduct by Defendant Bernatowicz constitutes a violation of the FMLA in that Bernatowicz interfered with the Plaintiff' taking of FMLA by refusing to credit the Plaintiff with the hours she was entitled to, which would have enabled her to take intermittent FMLA.

159.    As such, she would have been protected when she came in late due to her serious medical condition.

160.    The Plaintiff was entitled to FMLA protection, but Bernatowicz made sure she was not eligible by refusing to credit the hours she had worked at home.

161.    When the Plaintiff requested FMLA leave in November 2020, Bernatowicz interfered by terminating her pretextually before she could exercise that right.

162.    The actions of Defendant Bernatowicz by refusing to grant the Plaintiff FMLA and by firing her for having exercised her rights under the FMLA are violations of 29 U.S.C. Sec. 2615(a)(1).

163.    As a result of Defendant Bernatowicz's violations of the FMLA, Plaintiff has suffered damages as set forth herein.

**WHEREFORE**, Plaintiff seeks the damages set forth in the *Ad Damnum* clause of this Complaint, *infra.*

**COUNT II**
**RETALIATION FOR REQUESTING FMLA**
**PLAINTIFF VS. BERNATOWICZ**

164.    All of the allegations contained in the foregoing paragraphs are incorporated by reference herein as if the same were set forth at length.

165.    Defendant Bernatowicz is an "employer" as defined by the Family Medical Leave Act, within the definition set forth in 29 U.S.C. Sec. 2611(4)(A)(i)-(iii).

166.    Defendant Bernatowicz is engaged in commerce or an industry or activity affecting commerce that employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year.

167.    Bernatowicz is a person who acts, directly or indirectly, in the Defendants' interest to any of the employees of the Defendant P.N.C.

168.    Bernatowicz is an individual supervisor liable for FMLA violations as codified in the U.S. Department of Labor FMLA implementing regulations, 29 CFR 825.104(a), (d).

169.    The FMLA definition of "employer" is materially identical to the FLSA definition, and the Third Circuit has found individual liability for FLSA violations, including liability for lower-level supervisors.

170.    Bernatowicz was Plaintiff's "employer" as that term is used under the FMLA because an "employer" as "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer."

171.    Bernatowicz had the power to fire the Plaintiff.

172.    Bernatowicz supervised and controlled Plaintiff's work schedules or conditions of employment.

173.    Bernatowicz determined the rate and method of Plaintiff's payment.

174.    Bernatowicz maintained Plaintiff's employment records.

175.    Plaintiff was an "eligible employee" within the meaning of the FMLA because she was:

    a.    employed by Defendant for at least twelve (12) months; and

b.    worked at least 1,250 hours in the twelve months immediately preceding the scheduled commencement of her FMLA leave.

176.    Plaintiff requested FMLA to receive treatment in November 2020 for her serious medical condition.

177.    Plaintiff requested that her work hours be properly credited so she could benefit from intermittent FMLA.

178.    Defendant Bernatowicz refused to credit her with the hours she had worked at home, depriving her of FMLA eligibility.

179.    Defendant Bernatowicz pretextually terminated the Plaintiff from employment because she requested FMLA Retaliated against him, as aforesaid, for taking that FMLA leave.

180.    The actions taken by Defendant Bernatowicz would have seemed materially adverse to a reasonable employee.

181.    There exists a causal connection between the requests by the Plaintiff for FMLA and the refusal of Defendant Bernatowicz to grant those requests Plaintiff and to terminate the Plaintiff for requesting them.

182.    The foregoing conduct by Defendant Bernatowicz constitutes a violation of 29 U.S.C. Sec. 2615(a)(2).

183.    As a result of Defendant's violations of the FMLA, Plaintiff has suffered damages as set forth herein.

**WHEREFORE**, Plaintiff seeks the damages set forth in the *Ad Damnum* clause of this Complaint, *infra.*

4891-9902-9530, v. 5

## COUNT III
## RETALIATION FOR REQUESTING FMLA
## <u>PLAINTIFF VS. P.N.C.</u>

184.    All of the allegations contained in the foregoing paragraphs are incorporated by reference herein as if the same were set forth at length.

185.     Defendant P.N.C. is an "employer" as defined by the Family Medical Leave Act, within the definition set forth  in 29 U.S.C. Sec. 2611(4)(A)(i)-(iii).

186.    Defendant P.N.C. is engaged in commerce or an industry or activity affecting commerce that employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year.

187.    Defendant P.N.C. is Plaintiff's "employer" as that term is used under the FMLA.

188.    Plaintiff requested FMLA to receive treatment in November 2020 for her serious medical condition.

189.    Plaintiff requested that her work hours be properly credited so she could benefit from intermittent FMLA.

190.    Defendant Bernatowicz refused to credit her with the hours she had worked at home, thereby depriving her of FMLA eligibility.

191.    Defendant Bernatowicz pretextually terminated the Plaintiff from employment because she requested FMLA Retaliated against him as aforesaid, for taking that FMLA leave.

192.    The actions taken by Defendant Bernatowicz would have seemed materially adverse to a reasonable employee.

193.    There exists a causal connection between the requests by the Plaintiff for FMLA and the refusal of Defendant Bernatowicz to grant those requests Plaintiff and to terminate the Plaintiff for requesting them.

20

194.    The foregoing conduct by Defendant Bernatowicz constitutes a violation of 29 U.S.C. Sec. 2615(a)(2).

195.    As a result of Defendant's violations of the FMLA, Plaintiff has suffered damages as set forth herein.

*WHEREFORE*, Plaintiff seeks the damages set forth in the *Ad Damnum* clause of this Complaint, *infra.*

## *AD DAMNUM* CLAUSE/PRAYER FOR RELIEF

*WHEREFORE,* the Plaintiff prays that the Court enter judgment in his favor and against the Defendants and that it enter an Order as follows:

a.  The Defendants are to be permanently enjoined from engaging in discrimination against the Plaintiff based on her FMLA;

b.  The Defendants are to be prohibited from continuing to maintain their illegal policy, practice, or custom of discriminating against employees based on their violations of the Family Medical Leave Act and are to be ordered to promulgate an effective policy against such interference and retaliation and to adhere thereto;

c.  The Defendants are to remove the discipline and termination imposed on Plaintiff.

d.  The Plaintiff is to be awarded the costs and expenses of this action and reasonable attorneys' fees as provided by applicable federal law;

e.  The Plaintiff is to be accorded any and all other equitable and legal relief as the Court deems just, proper, and appropriate;

f.  The Plaintiff is to be reinstated into her position, as it was when she was terminated, with all back pay and benefits.

g.  The Court is to maintain jurisdiction of this action after verdict to ensure compliance with its Orders therein.

4891-9902-9530, v. 5

Respectfully submitted,

KOLMAN LAW, P.C.

By:    <u>/s/ Timothy M. Kolman, Esquire</u>
        Timothy M. Kolman, Esquire
        Attorneys for Plaintiff
        414 Hulmeville Avenue
        Penndel, PA  19047
        (215) 750-3134

April 14, 2022

4891-9902-9530, v. 5